# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ELSEVIER, INC.,

         Plaintiff,

    v.

VICTOR KOZLOV, PAVEL KAZUTSIN, and
IGOR KONIRIK,

         Defendants.

**Case No. 1:14-cv-2422-GHW**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND <u>PERMANENT INJUNCTION AGAINST DEFENDANTS</u>

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................III

**PRELIMINARY STATEMENT** ........................................................................................1

    A.  Procedural History ....................................................................................................1

    B.  Defendants Have Been Served and Have Actual Knowledge of This Action ....................2

    C.  Defendants Are in Default ..........................................................................................5

**DISCUSSION** ........................................................................................................................5

    I.      ELSEVIER IS ENTITLED TO A DEFAULT JUDGMENT AGAINST
            DEFENDANTS BASED UPON THE WELL-PLEADED ALLEGATIONS
            WHICH ARE DEEMED ADMITTED UPON DEFENDANT'S DEFAULT .............5

        A.  Personal Jurisdiction ................................................................................................6

        B.  Liability for Direct Copyright Infringement ................................................................8

        C.  Liability for Secondary Copyright Infringement ........................................................9

            1.  Legal Standard ....................................................................................................10

                a)  Inducement of Copyright Infringement ................................................................10

                b)  Contributory Copyright Infringement ................................................................10

                c)  Vicarious Copyright Infringement ........................................................................11

             2.  The Allegations in the SAC ................................................................................12

                a)  Elsevier's Business ..............................................................................................12

                b)  Defendants' Unlawful Conduct ............................................................................12

                 c)  How Avax Works ..................................................................................................13

                d)  Defendants Have Knowledge of and Are Culpable in the Infringing
                     Activity ..............................................................................................................15

                e)  Defendants Have Continued to Infringe Even After Receiving
                     Notice of this Lawsuit ........................................................................................18

i

**TABLE OF CONTENTS**
(Continued)

D.  Personal Liability ......................................................................................19

II.     PLAINTIFFS ARE ENTITLED TO AN AWARD OF STATUTORY
        DAMAGES FOR DEFENDANTS' WILLFUL INFRINGEMENT ..........................19

        A.  Statutory Damages Under the Copyright Act .......................................................20

        B.  Elsevier's Request for Statutory Damages is Reasonable Under the
            Circumstances Here ...............................................................................21


        C.  An Evidentiary Hearing to Determine Statutory Damages Is Not Required .........23


III.    DEFENDANTS SHOULD BE PERMANENTLY ENJOINED FROM
        INFRINGING PLAINTIFFS' COPYRIGHTS ......................................................... 24

CONCLUSION.................................................................................................... 27

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986) ................................................................3

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.* 239 F.3d 619 (4th Cir. 2001) ..............................4

*Arista Records, Inc. v. Flea World, Inc.,* No. 03-2670 (JBS), 2006 WL 842883,
2006 U.S. Dist. LEXIS 14988 (D.N.J. Mar. 31, 2006) ............................................10, 11

*Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481 (S.D.N.Y. 2010) .........9, 10, 11, 19

*Arista Records LLC v. Usenet.com*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) .....................10, 11, 19

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981) ......................................6

*Bravado Int'l Group Merch. Servs. V. Ninna, Inc.*, 655 F. Supp. 2d 177
(E.D.N.Y. 2009)...........................................................................................................19

*Broad. Music, Inc. v. Pamdh Enters.*, No. 13-Civ-2255 (KMW), 2014 WL 2781846,
2014 U.S. Dist. LEXIS 84409 (S.D.N.Y. June 19, 2014)......................................22, 23

*Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004) ........................................................3

*Burberry Ltd. v. EuroModa, Inc.*, No. 08-Civ-5781 (CM)(AJP), 2009 WL 4432678,
2009 U.S. Dist. LEXIS 113407 (S.D.N.Y. Dec. 4, 2009) ......................................22, 23

*Church & Dwight Co. v. Kaloti Enters. of Mich.*, 697 F. Supp. 2d 287 (E.D.N.Y. 2009) ......23, 24

*Citigroup Global Mkts, Inc. v. JWS 1999 Holding B.V.*, No. 08 Civ. 5362 (RJS), 2009 WL
2981912, 2009 U.S. Dist. LEXIS 83776 (S.D.N.Y. Sept. 11, 2009).................................5

*Columbia Pictures Indus. Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ...................................8, 10

*Craigslist, Inc. v. Doe*, Case No. C09-4739 SI, 2011 WL 1897423, 2011 U.S. Dist.
LEXIS 53123 (N.D. Cal. Apr. 25, 2011)......................................................................26

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)..........................................8

*Disney Enters. v. Hotfile Corp.*, Case No. 11-20427-CIV-WILLIAMS, 2013 WL
6336286, 2013 U.S. Dist. LEXIS 172339 (S.D. Fla. Aug. 28, 2013).............................4

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ....................................8

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110 (2d Cir. 1986) ................................20

# TABLE OF AUTHORITIES
(Continued)

**CASES**

*FTC v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 218 (S.D.N.Y. 2002)............................................6

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt, Inc.*, 443 F.2d 1159 (2d Cir. 1971) ........10, 11

*Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117 (S.D.N.Y. 2008) ......................................6

*JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910 (7th Cir. 2007)......................................................8

*Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283 (2d Cir. 1999) ..................................................20, 22

*Maletier v. Carduci Leather Fashions, Inc.*, 648 F. Supp. 2d 501 (S.D.N.Y. 2009)....................22

*McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252 (S.D.N.Y. 2005)...........7

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).................................................9, 10, 11

*N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250 (2d Cir. 1992)...............................22

*North Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd.*, No. 10-Civ-1630 (AKH)
(S.D.N.Y. Sept. 13, 2010) ............................................................................................................26

*Pearson Educ., Inc. v. Nugroho*, Case No. 08-CV-8034 (DAB) (AJP)
(S.D.N.Y. Oct. 10, 2013) .............................................................................................................26

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 640 F.3d 497 (2d Cir. 2011). ........................................7

*Philip Morris USA Inc. v. Marlboro Express, et al.*, No. 03-CV-1161 (CPS), 2005
WL 2076921, 2005 U.S. Dist. LEXIS 40359 (E.D.N.Y. Aug. 26, 2005)....................................22

*Phillip Morris USA, Inc. v. Otamedia, Ltd.*, 331 F. Supp. 2d 228 (S.D.N.Y. 2004) ....................26

*Rogers v. eColor Studio*, No. 11-CV-4493 (ARR) (RER), 2013 U.S. Dist. LEXIS 28332
(E.D.N.Y. Feb. 7, 2013)..................................................................................................................7

*Rolex Watch U.S.A., Inc. v. Brown,* No. 01 Civ. 9155 (JGK) (AJP), 2002 WL 1226863,
2002 U.S. Dist. LEXIS 10054 (S.D.N.Y. June 5, 2002)..........................................................23, 24

*Software Freedom Conservancy, Inc. v. Best Buy Co.,* No. 09-Civ10155 (SAS), 2010
WL 2985320, 2010 U.S. Dist. LEXIS 75208 (S.D.N.Y. July 27, 2010) ......................................25

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010). ........................................................................6

# TABLE OF AUTHORITIES
(Continued)

## CASES

*Starbucks Corp. v. Morgan*, No. 99 Civ. 1404, 2000 WL 949665, 2000 U.S. Dist. LEXIS 14677 (S.D.N.Y. July 11, 2000) .................................................................................6

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488 (4th Cir. 1996) ..........................................................................................................20

*Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*, 778 F.2d 89 (2d Cir. 1985) ...................19

*Tamarin v. Adams Caterers, Inc.*, 3 F.3d 51 (2d Cir. 1993) ....................................................23, 24

*Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123 (S.D.N.Y. 2003) ...............................................22

*TigerCandy Arts, Inc. v. Blairson Corp.*, No. 09-Civ-6215 (GBD), 2012 WL 760168, 2012 U.S. Dist. LEXIS 35269 (S.D.N.Y. Feb. 23, 2012) ............................................................24

*Tracfone Wireless, Inc. v. Bitton*, 278 F.R.D. 687 (S.D. Fla. 2012) ..............................................3

*True Religion Apparel, Inc. v. Xiaokang Lei*, et al., No. 11-Civ-8242 (HB) (S.D.N.Y. Mar. 12, 2012) ....................................................................................20, 21, 26

*Union of Orthodox Jewish Congregation of Am. v. Royal Food Distribs. LLC*, 665 F. Supp. 2d 434 (S.D.N.Y. 2009) ..........................................................................6, 20

*Weight v. Kawasaki Heavy Indus.*, 597 F. Supp. 1082 (E.D. Va. 1984) .......................................3

## STATUTES

17 U.S.C. §§ 101, *et seq.* ......................................................................................... 1, 9

17 U.S.C. § 106 ..................................................................................................................8

17 U.S.C. § 504 ................................................................................................................20

17 U.S.C. § 512 ..................................................................................................................4

28 U.S.C. § 1338 ............................................................................................................... 1

## TABLE OF AUTHORITIES
(Continued)

**RULES**

Fed. R. Civ. P. 4 ........................................................................................................2, 4

Fed. R. Civ. P. 55 .......................................................................................................1, 5

N.Y. C.P.L.R. § 302 ...................................................................................................6, 8


**OTHER AUTHORITIES**

Hague Convention art. 10, Nov. 15, 1965, 20 U.S.T. 361 ........................................3

Status Table, Members of the Organisation, Hague Conference on Private International
International Law, http://www.hcch.net/index_en.php?act=conventions.status&cid=17
(last visited Mar. 3, 2015). .......................................................................................2

Table Reflecting Applicability of Art. 8(2), 10(a) (b) and (c), 15(2) and 16(3) of the
Hague Service Convention, http://www.hcch.net/upload/applicability14e.pdf
(last visited Mar. 3, 2015). .......................................................................................3

1 James Wm. Moore et al., Moore's Federal Practice § 4.52 (Matthew Bender 3d ed.)................3

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Plaintiff Elsevier, Inc.

submits this Memorandum of Law in Support of its Motion for Default Judgment and Permanent

Injunction Against Defendants Victor Kozlov and Pavel Kazutsin ("Defendants") for direct and

secondary copyright infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*.  This Court

has original jurisdiction over this action pursuant to 28 U.S.C. § 1338(a).

## PRELIMINARY STATEMENT

Defendants in this case are the primary actors behind a blatantly illegal online service.

Branded under the name "Avax," their operation consists of a group of integrated websites that

exist for the sole purpose of providing visitors with quick, easy, and free access to complete,

unauthorized digital copies of books, movies, music, television programs, software, magazines,

comics, newspapers, games, and other copyrighted content.  Defendants profit through the

display of advertising on their websites, as well as by selling registrations for "ad-free" access,

among other methods.  Despite having been served with process in this action, Defendants have

failed to respond.  In light of Defendants' default, Elsevier now seeks the entry of a default

judgment and permanent injunction against Defendants.  In doing so, Elsevier seeks the

following:  1) a declaration that Defendants Victor Kozlov and Pavel Kazutsin, through their

operation of the Avax websites, are liable for direct copyright infringement and secondary

copyright infringement; 2) $37,500,000 in statutory damages for Defendants' willful

infringement of Elsevier's copyrights; and 3) a permanent injunction restraining Defendants

from further infringement.

### A.    **Procedural History**

Elsevier initiated this action against John Doe defendants on April 7, 2014.  (ECF No. 2.)

On April 21, 2014, Elsevier filed an Amended Complaint.  (ECF No. 6.)  Then, on April 29,

2014, Elsevier moved the Court for leave to take expedited discovery in aid of service (ECF No. 9), which the Court granted (ECF No. 12).  Subsequently, Elsevier served subpoenas on various third parties to identify and locate Defendants and serve process.  On October 13, 2014, Elsevier filed its Second Amended Complaint (ECF No. 26) (the "SAC") naming as Defendants Victor Kozlov, Pavel Kazutsin, and Igor Konirik.[1]

### B.    Defendants Have Been Served and Have Actual Knowledge of This Action

Defendant Victor Kozlov is a resident of Israel and Defendant Pavel Kazutsin is a resident of Belarus.  Declaration of Kerry M. Mustico, submitted herewith ("Mustico Decl."), ¶ 14.  Elsevier properly served Kozlov and Kazutsin pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii) by having the Clerk of Court send by Federal Express the summons and the SAC to Kozlov (ECF No. 38), and the summons, SAC, and translations thereof to Kazutsin (ECF No. 43).[2]  *Id.* ¶ 13; Certificates of Mailing, *id.,* Ex. D, E.  Service was completed on Kozlov on November 24, 2014 (*see* Clerk's docket entry on Dec. 5, 2014) and on Kazutsin on January 13, 2015 (*see* Clerk's docket entry on Jan. 28, 2015).

Israel and Belarus are parties to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention").  *See* Status Table, Members of the Organisation, Hague Conference on Private International Law, http://www.hcch.net/index_en.php?act=conventions.status&cid=17 (last visited Mar. 3, 2015).

---

[1] At this time, it is unclear whether Igor Konirik is a real individual rather than just a pseudonym used by the other Defendants.  Accordingly, Elsevier hereby dismisses its claims against Igor Konirik without prejudice.

[2] Rule 4(f)(2)(C)(ii) provides, in relevant part, that service upon an individual in a foreign country may be made "if there is no internationally agreed means, of if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice … (C) unless prohibited by the foreign country's law, by: … (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt…."  *See* Fed. R. Civ. P. 4(f)(2)(C)(ii).

Article 10(a) of the Hague Convention allows for service of judicial documents via means other than through a contracting state's Central Authority, such as "postal channels," provided that the destination state does not object to those means.  Hague Convention art. 10, Nov. 15, 1965, 20 U.S.T. 361.  Neither Israel nor Belarus has objected to Article 10(a).  *See* Table Reflecting Applicability of Art. 8(2), 10(a) (b) and (c), 15(2) and 16(3) of the Hague Service Convention, http://www.hcch.net/upload/applicability14e.pdf (last visited Mar. 3, 2015).

The Second Circuit, as well as several other Circuits, hold that a member state authorizes service by mail under the Hague Convention if the consenting member state has not objected to Article 10(a).  *See Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986) (service by registered mail permitted by Hague Convention); *Brockmeyer v. May*, 383 F.3d 798, 802 (9th Cir. 2004) ("[W]e join the Second Circuit in holding that the meaning of 'send' in Article 10(a) includes 'serve.'"); *Tracfone Wireless, Inc. v. Bitton*, 278 F.R.D. 687, 691 (S.D. Fla. 2012) (Article 10(a) permits service by mail unless foreign country objects); *Weight v. Kawasaki Heavy Indus.*, 597 F. Supp. 1082, 1085-86 (E.D. Va. 1984) (holding that because Japan had not objected to service by mail under Article 10(a), plaintiff properly served Japanese defendant by giving complaint to Secretary of Commonwealth to serve by mail as provided by Virginia law).  The rationale is that if a member state does not object to the Hague Convention's service by other means, including "postal channels," the member state subjects their citizens to service by mail.  *See* 1 James Wm. Moore et al., Moore's Federal Practice § 4.52(2)[d] (Matthew Bender 3d ed.).  Thus, Elsevier properly served Defendants Kozlov and Kazutsin in Israel and Belarus, respectively, by having the Clerk of Court send the summons and SAC to Defendants by Federal Express.[3]

---

[3] Although not necessary to do so, Elsevier also served Kozlov in Israel via Israel's Central Authority pursuant to the Hague Convention.  *See* Mustico Decl. ¶ 16.  Hague Convention service on Kozlov was completed on November 25, 2014.  *Id.* ¶ 16.  Likewise, while not

After initiating this suit, to ensure Defendants received actual notice of this action, Elsevier's counsel sent an email to Defendants using the email addresses associated with the Avax sites, including support@avaxhome.ws.  SAC ¶ 39; Mustico Decl. ¶ 6, Ex. A.  The email attached a copy of the Amended Complaint and supporting papers, the Court's April 15, 2014 Order setting the initial conference, and Elsevier's papers in support of its motion for expedited discovery.  *Id.*  The very same day, counsel received a reply email from Defendants using the email address support@avaxhome.ws.  *Id.* ¶ 7, Ex. B.  In the initial reply, Defendants denied having anything to do with the "attached documents" and stating that counsel must have them confused with someone else.  *Id.*  The email was from "Paul" (the Anglicized version of one of the Defendants' names, Pavel).  *Id.*  The next day, however, on their own initiative, Defendants sent an additional reply to counsel regarding the content on Avax (tacitly acknowledging their operation and control of the site), denying that any content related to "Elsevier Inc. or its subsidiaries."[4]  *Id.* ¶ 8, Ex. C.  Elsevier's counsel tried to engage further with Defendants,

---

required, Elsevier initiated service on Kazutsin in Belarus via Belarus' Central Authority pursuant to the Hague Convention.  *Id.*  However, at the time of filing, such service had not been completed.  *Id.*  Nonetheless, for the reasons described above, Kazutsin has been properly served pursuant to Rule 4(f)(2)(C)(ii).

[4] Defendants also raised the bogus claim that they "are under protection of Digital Millennium Copyright Act ("DMCA")" because their site is a platform for users to share information and therefore does not contain user-generated content.  Mustico Decl. ¶ 8, Ex. C.  The DMCA is of no relevance here.  Among other reasons, and as a threshold matter, the DMCA is unavailable with respect to a website that has not designated a registered agent with the Copyright Office for purposes of receiving takedown notices concerning alleged infringement and posted the registered agent's name and address on the site.  *See* 17 U.S.C. § 512(c)(2); *Disney Enters. v. Hotfile Corp.*, Case No. 11-20427-CIV-WILLIAMS, 2013 WL 6336286, 2013 U.S. Dist. LEXIS 172339, at * 81-84 (S.D. Fla. Aug. 28, 2013).  Defendants have not done so.  Declaration of Matthew Stratton, submitted herewith ("Second Stratton Decl.") ¶ 9.  In addition, the DMCA is meant only for "innocent service providers who can prove they do not have actual or constructive knowledge of the infringement."  *ALS Scan, Inc. v. RemarQ Cmtys., Inc.* 239 F.3d 619, 625 (4th Cir. 2001) (noting that DMCA's protection "disappears at the moment the service provider … becomes aware that a third party is using its system to infringe").  Defendants are clearly outside that category.

including by sending them copies of the subpoenas being served on Avax's service providers. *Id.* ¶ 9.  Defendants simply denied having "any content related to" Elsevier despite having received a copy of Exhibit A, which lists the infringing works available through the Avax sites. *Id.* & Ex. D.  But, instead of stopping their infringing activities, Defendants knowingly continued them.  Second Stratton Decl. ¶¶ 5-7.  Worse yet, Defendants moved their sites to new domains names, no doubt in an attempt to evade Elsevier's enforcement efforts.  *See id* ¶ 5; Declaration of Matthew Stratton filed in support of Plaintiffs' Motion for Expedited Discovery (ECF No. 7-3) ("Stratton Decl.") ¶ 21; *see also* Section I.C.2.c, *infra*.

C.      **Defendants Are in Default**

Kozlov's response to the SAC was due on December 15, 2014.  Mustico Decl. ¶ 15. Kazutsin's response to the SAC was due on February 3, 2015.  *Id.*  Neither Defendant responded to the SAC, nor otherwise appeared in this case.  *Id.*  Accordingly, upon Elsevier's requests and supporting declarations, pursuant to Local Rule 55.1, the Clerk of Court entered a Certificate of Default against Kozlov on January 29, 2015 (ECF No. 44), and against Kazutsin on February 11, 2015 (ECF No. 47).

**DISCUSSION**

**I.      ELSEVIER IS ENTITLED TO A DEFAULT JUDGMENT AGAINST DEFENDANTS BASED UPON THE WELL-PLEADED ALLEGATIONS WHICH ARE DEEMED ADMITTED UPON DEFENDANTS' DEFAULT**

Elsevier is entitled to a default judgment under Federal Rule of Civil Procedure 55 because Defendants have failed to appear and have failed to answer the SAC.  *See Citigroup Global Mkts, Inc. v. JWS 1999 Holding B.V.*, No. 08 Civ. 5362 (RJS), 2009 WL 2981912, 2009 U.S. Dist. LEXIS 83776, at *2 (S.D.N.Y. Sept. 11, 2009) ("Entry of default judgment is appropriate when the adversary process has been halted because of an essentially unresponsive

party.") (internal quotations and citations omitted).  Defendants here were properly served and

failed to respond.  *See* Clerk's Certificates of Default (ECF Nos. 44, 47).

Defendants' failure to answer the SAC precludes them from raising any "meritorious

defense" to the claims asserted against them because "[e]ntry of default constitutes an admission

of well-pleaded allegations of the complaint by the defaulted party."  *FTC v. 1263523 Ontario,*

*Inc.*, 205 F. Supp. 2d 218, 221 (S.D.N.Y. 2002); *see also Union of Orthodox Jewish*

*Congregation of Am. v. Royal Food Distribs. LLC,* 665 F. Supp. 2d 434, 436 (S.D.N.Y. 2009)

("When the Court enters a default judgment, as regards liability it must 'accept [] as true all of

the factual allegations of the complaint ….") (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653

F.2d 61, 65 (2d Cir. 1981)); *Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 119

(S.D.N.Y. 2008) ("A plaintiff's factual allegations, except those relating to damages, must be

accepted as true where, as here, the defendant defaults."); *Starbucks Corp. v. Morgan*, No. 99

Civ. 1404, 2000 WL 949665, 2000 U.S. Dist. LEXIS 14677, at \*2 (S.D.N.Y. July 11, 2000)

(factual allegations in complaint "taken as true" when defendant is in default).  Thus,

Defendants, by their default, have conceded all well-pleaded allegations of the SAC as described

below.

### A.     Personal Jurisdiction

The Court has personal jurisdiction over Defendants in this case.  Federal courts look to

the law of the forum state to determine whether a defendant is subject to personal jurisdiction.

*See Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010).  Section 302(a)(3)(ii) of the New York

CPLR states that a court may exercise personal jurisdiction over an out-of-state defendant when

he "commits a tortious act without the state causing injury to a person or property within the

state … if he … expects or should reasonably expect the act to have consequences in the state

and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R.

302(a)(3)(ii).

Elsevier has alleged claims of copyright infringement, which is a tort.  *See Rogers v. eColor Studio*, No. 11-CV-4493 (ARR) (RER), 2013 U.S. Dist. LEXIS 28332, at *6 (E.D.N.Y. Feb. 7, 2013) ("Copyright infringement is a commercial tort.") *report and recommendation adopted by* 2013 U.S. Dist. LEXIS 27029 (E.D.N.Y. Feb. 27, 2013).  The tort was committed outside New York, presumably in Israel and/or Belarus, where the Avax websites were created and maintained.  *See id.* (noting tort presumably occurred in India where defendant created and maintained the website).  And, Elsevier, a company with its principal place of business in New York (SAC ¶ 11; Stratton Decl. ¶ 3), is injured in New York when its copyrights are infringed via the Internet.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 640 F.3d 497, 501 (2d Cir. 2011).

Elsevier has also established that Defendants should have reasonably expected their cyber-piracy to have consequences in New York where Elsevier is located.  *See McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 256 (S.D.N.Y. 2005) (finding it "reasonably foreseeable that the provision of materials that infringe the copyrights and trademarks of a New York company will have consequences in New York").  "This is particularly true where, as here, Defendants are found to have infringed Plaintiff's copyright knowingly and willfully."  *See Rogers*, 2013 U.S. Dist. LEXIS 28332, at *8.  Finally, as discussed below, Defendants operate their illegal scheme internationally with a particular emphasis on the United States.  Although more of Avax's web traffic comes from the United States than any other single country, 86% of Avaxhome.cc's web traffic and 88% of Avaxhm.com's web traffic come from users located outside the United States.  *See* SAC ¶ 28; Stratton Decl. ¶ 20.  Thus, a substantial portion of Avax's revenue, which is driven by its web traffic, comes from international commerce.  *See* Section I.C.2.d, *infra*.  Accordingly,

Defendants are subject to this Court's personal jurisdiction pursuant to New York's long-arm statute.  A separate Due Process analysis is unnecessary.  New York's CPLR does not extend to the limit of Due Process.  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements.").

**B.      Liability for Direct Copyright Infringement**

In order to prevail on a case of copyright infringement, Elsevier must demonstrate only that: (1) they own valid copyrights; and (2) the defendant violated one or more of the exclusive rights in 17 U.S.C. § 106.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914-915 (7th Cir. 2007).  Registration alone is *prima facie* evidence that the plaintiff owns valid copyrights for the works at issue.  *JCW Invs., Inc.*, 482 F.3d at 914-15.  The exclusive rights specified under 17 U.S.C. §106 include the right to reproduce the copyrighted works and to distribute copies of the copyrighted works to the public.  "Both uploading and downloading copyrighted material are infringing acts.  The former violates the copyright holder's right to distribution, the latter the right to reproduction."  *Columbia Pictures Indus. Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) (citing 17 U.S.C. § 106(1) & (3)).

Here, Elsevier alleges, *inter alia*, that it is the owner or exclusive licensee of all rights, title, and interest in and to the works described on Exhibit A to the SAC (hereinafter, the "Copyrighted Works"), which have never been assigned, licensed, or otherwise transferred to any of Defendants.  SAC ¶ 18; Stratton Decl. ¶¶ 7, 36.  Defendants, with knowledge of Elsevier's copyrights in the Copyrighted Works, infringed Elsevier's copyrights by deliberately distributing unauthorized copies of Elsevier's Copyrighted Works for profit.  SAC ¶ 24 ("When

Avax distributes a copy of [Elsevier's] book cover, Avax is engaged in direct infringement."); *id.* ¶¶ 45-47.  The SAC also alleges that Defendants' infringing activities were and are deliberate, intentional, malicious, and willful, *id.* ¶ 48, which have caused and continue to cause Elsevier irreparable damage, *id.* ¶ 51, all in violation of the Copyright Act, 17 U.S.C. §§ 101 *et seq.* Because these factual allegations are deemed true upon default, Elsevier has sufficiently established that Defendants are liable for willful copyright infringement.  These allegations are further supported by the Second Stratton Declaration ¶¶ 5-10.

### C.      Liability for Secondary Copyright Infringement

In addition to its claim for direct copyright infringement, Elsevier has alleged that Defendants are secondarily liable for the infringing acts of the Avax service's users.  Here, Elsevier has alleged that Defendants are liable for (1) inducement of copyright infringement, (2) contributory copyright infringement, and (3) vicarious copyright infringement.  SAC ¶¶ 52-60. As with Elsevier's claim of direct infringement, Elsevier's factual allegations are deemed true upon Defendants' default, and they are further supported by declarations.

In a case like this one, the rationale for secondary liability is particularly powerful. "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copyright device for secondary liability on a theory of contributory or vicarious infringement."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005); *see also Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 506 (S.D.N.Y. 2010) ("[A] party who distributes infringement-enabling products or services may facilitate direct infringement on a massive scale, making it impossible to enforce copyright protection effectively against all direct infringers.").

1.      **Legal Standard**

a)      Inducement of Copyright Infringement

"To establish a claim for inducement, a plaintiff must show that the defendant (1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement."  *See Lime Group*, 715 F. Supp. 2d at 508 (finding liability for inducing infringement where software that defendant distributed and maintained was used by others to infringe); *accord Grokster,* 545 U.S. at 936 (internal quotations and citations omitted) (finding individuals and companies secondarily liable for the copyright infringement of others using the Internet to download protected material via defendants' software).  A claim for inducement of copyright infringement applies to inducement via the provision of an Internet service, as well as to the distribution of devices or products.  *See, e.g., Fung*, 710 F.3d at 1031-39 (finding liability for inducing infringement and noting that "one can infringe a copyright through culpable actions resulting in an impermissible reproduction of copyrighted expression, whether those actions involve making available a device or product or providing some service used in accomplishing the infringement."); *Arista Records LLC v. Usenet.com*, 633 F. Supp. 2d 124, 151 (S.D.N.Y. 2009) (inducement with respect to Internet-based service).

b)      Contributory Copyright Infringement

"A party is liable for contributory infringement if, 'with knowledge of the infringing activity,' it 'induces, causes, or materially contributes to the infringing conduct of another.'" *Usenet.com*, 633 F. Supp. 2d at 154 (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  A defendant's knowledge for purposes of contributory infringement can be actual or constructive.  *Id.*  Thus, turning a "blind eye" to infringement can satisfy the knowledge requirement.  *Id.*  Moreover, a defendant need not have knowledge of specific infringements to be held liable for contributory infringement.  *Id.* (citing

10

*Arista Records, Inc. v. Flea World, Inc.,* No. 03-2670 (JBS), 2006 WL 842883, 2006 U.S. Dist. LEXIS 14988, at *47-48 (D.N.J. Mar. 31, 2006)).  The materiality component of contributory infringement "has been found to be met where a defendant provides the 'site and facilities' or the 'environment and market' for infringing activity."  *Id.* at 124 (finding that defendants' Internet-based service provided the "site and facilities" for its users to download infringing music); *Flea World*, 2006 U.S. Dist. LEXIS 14988, at *51 (holding that defendants' flea market provided the "central hub" for the infringing activity at issue, i.e., the sale of counterfeit records).

c)      <u>Vicarious Copyright Infringement</u>

A party is liable for vicarious copyright infringement if it "profit[s] from direct infringement while declining to exercise a right to stop or limit it."  *Grokster*, 545 U.S. at 930; *see also Gershwin*, 443 F.2d at 1162.  "Thus, vicarious liability is premised wholly on direct financial benefit and the right and ability to control infringement; it does not include an element of knowledge or intent on the part of the vicarious infringer."  *Usenet.com*, 633 F. Supp. 2d at 156.  The Second Circuit has found that a "defendant need not have 'formal power to control' where a direct infringer 'depends upon the defendant for direction.'"  *Usenet.com*, 633 F. Supp. 2d at 157 (quoting *Gershwin*, 443 F.2d at 1163) (holding in context of Internet-based service that defendants had control where they reserved the right to terminate, suspend, or restrict users' ability to upload or download content to or from defendants' servers).  Moreover, financial benefit does not need to be tied directly to the infringement.  *See Lime Group*, 715 F. Supp. 2d at 518; *Usenet.com*, 633 F. Supp. 2d at 157.  Rather, it may be established by showing that the infringing content is a draw—and not necessarily the primary draw—that serves to entice users to the defendants' service.  *Usenet.com*, 633 F. Supp. 2d at 157 ("[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw – rather, it need only be 'a' draw.").

11

### 2.      The Allegations in the SAC

#### a)      Elsevier's Business

Elsevier is one of the leading global educational publishers.  SAC ¶ 14; Stratton Decl. ¶ 3.  Headquartered in New York, it provides a comprehensive range of traditional and digital educational content and tools to professionals and students.  SAC ¶ 6; Stratton Decl. ¶ 3.  Elsevier's publications include physical and digital textbooks, and other professional and scholarly books, as well as online publications. SAC ¶ 15; Stratton Decl. ¶ 4.  These books are widely available in the marketplace for sale, rental, and/or subscription, including from physical and online bookstores.  *Id.*

Elsevier is the copyright owner of, and/or the owner of exclusive rights in, among many others, the Copyrighted Works.  SAC, Ex. A; Stratton Decl. ¶ 36.  Elsevier, or its affiliates, has duly registered its copyrights in the Copyrighted Works.  *See id*.  With its principal place of business in New York City, SAC ¶ 6; Stratton Decl. ¶ 3, Elsevier is injured there by infringement of its copyrights.

#### b)      Defendants' Unlawful Conduct

Defendants engage in acts of willful infringement through their operation of a group of Internet websites, which act together as one integrated service (hereinafter, "Avax").  SAC ¶ 20; Stratton Decl. ¶ 8. Defendants provide their users with an integrated service through which they can, with just several clicks of a mouse, quickly locate and download permanent copies of copyrighted materials.  SAC ¶ 20; Stratton Decl. ¶¶ 8-9.  The object of Defendants' Avax business is to attract Internet users searching for pirated content and then profit handsomely from the subsequent serving of digital advertising to such users.  Stratton Decl. ¶ 9.  The overwhelming, if not sole function of Avax, is to provide users with ready access to permanent, unauthorized copies of popular commercial content, including many of Elsevier's most valuable,

scholarly, and professional books.  *Id*.  Indeed, Defendants place a heavy emphasis on "eBooks & Learning" content.  *Id.* ¶ 11. Defendants even refer to their service as "the best eBook site ever for … free download."  *Id.*

c)      <u>How Avax Works</u>

To accomplish their infringement, Defendants' Avax service maintains a vast, searchable index of infringing copies of copyrighted works.  SAC ¶ 22; Stratton Decl. ¶ 12.  Users go to Defendants' service for quick, easy, and free access to the listings within this index, which contain links to download the copyrighted works depicted in the listings.  *Id*.  Beyond Avax helping users to quickly and easily obtain the copyrighted content they wish to download for free, Defendants promote further unauthorized reproduction and distribution.  SAC ¶ 29; Stratton Decl. ¶ 21.  They do this by embedding functionality to encourage and enable the user to share the Avax listings for infringing files with others, including through Facebook.  *Id*.

At the time Elsevier filed the Complaint and the Amended Complaint, Defendants operated the Avax service through a main site at www.axaxhome.cc ("Main Site"), a search interface at www.avaxsearch.com ("Search Interface" or "Search Interface Site"), and an image-hosting site at www.pixhost.me ("Image-Hosting Site").  SAC ¶ 21; Stratton Decl. ¶ 8.  After Elsevier initiated this action—and after Defendants received actual notice of the suit—Defendants continued to their infringing activity, but switched to new domain names.  *Id*.  At the time of filing the SAC, Defendants had moved the Main Site to www.avaxhm.com, the Search Interface to www.avaxsearch.net, and the Image-Hosting Site to www.pixhst.com.  The infringing activity is the same however, regardless the particular domain names used in the past, present, or future.  *Id.*

The Main Site provides organized listings of infringing copies of copyrighted works that are available on certain "locker" websites.  SAC ¶ 23; Stratton Decl. ¶ 13.  The actual files are

13

hosted on and spread across a number of third-party websites and servers on the Internet ("Source Sites"). *Id*. The listings for books on the Main Site include an unauthorized reproduction of the cover of the book, along with information about the book, including author, publication date, International Standard Book Number ("ISBN"), number of pages, and format of the file. SAC ¶ 24; Stratton Decl. ¶ 14. By clicking on the title of the item, the user is brought to a page on the Main Site that contains links for downloading the copyrighted item from one or more Source Sites. *Id*. When Avax distributes a copy of the book cover to the user, Avax is engaged in direct infringement. SAC ¶ 24; Stratton Decl. ¶ 12. Moreover, when an Avax user downloads from a Source Site an unauthorized copy of an Elsevier book, the user is engaged in direct infringement that Avax has induced, facilitated, encouraged, and from which it derives profits. *Id*. Absent Defendants' service, the widespread unauthorized copying and distribution of Elsevier's and others' copyrighted works via these Source Sites would not happen on the scale that it does. SAC ¶ 22; Stratton Decl. ¶ 14.

Users can access the listings on the Main Site in multiple ways. SAC ¶ 25; Stratton Decl. ¶ 15. At the homepage, the user can scroll through listings to find unauthorized copies of copyrighted works that may be of interest to the user. *Id*. Alternatively, rather than scrolling through the homepage, the user can select a category, *i.e.*, "eBooks & eLearning | Video | Music | Software | Magazines | Comics | Newspapers | Games | Graphics | Misc | Vinyl & HR | AH News." *Id*. These categories are then further divided into subcategories. *Id*. The user can scroll through the listings within each category or sub-category of their choosing. *Id*. Finally, the Main Site also has a search function, which allows the user to locate an unauthorized copy of a copyrighted work by keyword search. *Id*. Users can perform a keyword search directly on the Main Site or the Search Interface Site. SAC ¶ 26; Stratton Decl. ¶ 16. Clicking on search results

on the Search Interface Site brings users to the Main site.  *Id*.  The Search Interface Site is more sophisticated than the search function on the Main Site.  *Id*.  At the Search Interface Site, the user is not limited to searching just by keyword.  *Id*.  Rather, the user can further restrict the keyword search to the appropriate category (*e.g.*, "eBooks & eLearning"), language, author, and can also sort by relevance and date.  *Id*.

The Image-Hosting Site stores and serves up to the Main Site's visitors the unauthorized reproductions of the book covers, including Elsevier's book covers.  SAC ¶ 27; Stratton Decl. ¶ 17.  The Image-Hosting Site has no mechanism to create an account and upload images.  SAC ¶ 27; Stratton Decl. ¶ 18.  The site seems to exist only to support image hosting for the Main Site and related sites.  *Id*.  Notably, the Image-Hosting Site shares some of the same email addresses, webpages, and ad service providers used by the other Avax sites.  *Id*.

### d)   Defendants Have Knowledge of and Are Culpable in the Infringing Activity.

Avax is not a "UGC" (user-generated content) site for uploading homemade videos or self-published books, or providing links to such works.  SAC ¶ 30; Stratton Decl. ¶ 22.  Rather, its entire purpose is to make full-length, commercial works created by others readily accessible, so that permanent copies can be downloaded.  *Id*.  Defendants' and their users' reproduction and distribution of Elsevier's valuable copyrighted works occurs without authorization or any compensation to Elsevier, its authors, and others in the legitimate chain of commerce.  SAC ¶ 31; Stratton Decl. ¶¶ 24, 38.

Defendants know exactly what is happening on their service, as they designed it and actively operate it.  SAC ¶ 32.  In fact, recognizing the illegal and infringing nature of their service, Defendants have prepared their user base for the day when "some media mogul" may cause the service to be blocked.  SAC ¶ 33; Stratton Decl. ¶ 28.  To ensure their users have

uninterrupted access, Defendants even suggested in a post on their service that users employ a particular technology that circumvents blocking of the site's IP address.  *Id*.  What's more, knowing the risk their illegal service presents, Defendants operate Avax anonymously.  Stratton Decl. ¶ 39.  None of the Avax websites identify the operators of the sites, nor do they provide a physical address or location.  *Id*.  On the contrary, Defendants have structured their business so that the only means of contacting Defendants is via email, *e.g.*, to support@avaxhome.ws.  *Id*.

Anyone who visits Defendants' service—including Defendants themselves—can immediately observe the catalog of infringing files that Defendants provide to users.[5]  SAC ¶ 32; Stratton Decl. ¶ 23.  Indeed, Defendants' service provides a seemingly endless number of listings so that users can download complete, obviously unauthorized, digital copies of copyrighted books, movies, magazines, software, games, and more.  *Id*.  It is also clear that the owners of the copyrighted works downloaded as a result of Defendants' service have not authorized the free, unrestricted copying and distribution of their works on the Internet.  SAC ¶ 31; Stratton Decl. ¶ 24.  On the contrary, such copying and distribution is inconsistent with how the owners of these copyrighted works commercialize their works.  Stratton Decl. ¶ 24.

To use the first three webpages in the "eBooks & eLearning" category on Avax as an illustration, the listings for all 39 of those "eBooks" contain links that allow Avax users to download free digital copies.  *Id*. ¶ 25.  Rather than give their copyrighted works away for free, however, the copyright owners of these works sell them through legitimate distribution channels for a fee.  *Id*.  Likewise, searching for popular copyrighted content on Avax, such as, for example, books by the well-known author, Malcolm Gladwell, and the hugely successful "Game of Thrones" series on HBO, yields multiple listings that contain links for Avax users to

---

[5] Defendants even maintain sub-categories as brazen as "bootleg" and "unreleased."  SAC ¶ 32; Stratton Decl. ¶ 23.

download free digital copies.  *Id*. ¶¶ 26-27.  In fact, digital copies of all of Malcolm Gladwell's books are available to Avax users for free download through Avax.  *Id*. ¶ 26.  Similarly, digital copies of multiple products from the "Game of Thrones" franchise—including episodes of the televisions series, books, PC games, and the music soundtrack from the series—are available for free download to Avax users through Avax.  *Id*. ¶ 27.  These are but a few examples of the vast catalogue of infringing works available for free download through Defendants' service.

Defendants directly profit from their and their users' infringement.  The infringing content, including Elsevier's works, is the draw that attracts visitors.  SAC ¶ 37; Stratton Decl. ¶ 9.  The more users that Defendants attract to their sites through the lure of free copyrighted content, the more money they make via advertising revenue and the higher the value of the sites.  SAC ¶ 37; *see also* Stratton Decl. ¶ 37.  In addition, Defendants' registered users pay varying prices for accounts that offer ad-free surfing for a period of one to six months.  SAC ¶ 37; Stratton Decl. ¶ 33.  Finally, Defendants likely are receiving a referral fee from the Source Sites that Defendants require be included in the listings.   SAC ¶ 37; Stratton Decl. ¶ 34.

Defendants exercise significant control over the infringing activity on their service.  They could stop or limit the infringement if they so chose.  Defendants decide who can post listings on the service and specify what content can be posted and what the listings must contain.  SAC ¶ 34; Stratton Decl. ¶ 29.  For example, Defendants request that users upload books, software, magazines, newspapers, and other types of obviously copyrighted works, and that posts contain links to complete works, rather than just a portion of the copyrighted work.  *Id*.  In addition, Defendants demand that all posts of listings for copyrighted books must include a picture of the book cover.  SAC ¶ 35; Stratton Decl. ¶ 30.  Likewise, all posts for books must include the ISBN, number of pages, year of publication, edition, book format, and size of download.  *Id*.

Moreover, Defendants review and moderate the posts on the Avax websites.  SAC ¶ 36; Stratton

Decl. ¶ 31.  For example, Defendants ban users when they see fit (though for reasons unrelated to

copyright infringement).  *Id.*  Defendants also highlight the "outstanding" posted links and delete

the redundant or dead links.  *Id.*  But, because Defendants profit from the infringing activity, they

have chosen not to stop or limit it.

> e)   Defendants Have Continued to Infringe Even After Receiving
>       Notice of this Lawsuit.

Even after receiving notice of this lawsuit, engaging with Elsevier's counsel regarding its

infringement claims, and receiving notice of the request for entry of default, Defendants have

added more infringing copies of Elsevier's works to the Avax service.  Second Stratton Decl. ¶ 7.

Indeed, just prior to filing the motion for default judgment, Elsevier identified 26 infringing

copies of Elsevier's copyrighted works available through the Avax service in addition to the

works identified on Exhibit A.  *Id.*

Still worse, Defendants began operating an additional site, located at

www.ebooksmgzn.com (the "Ebooks Site"), which, as its domain name implies, focuses entirely

on providing access to infringing copies of books, including Elsevier's copyrighted textbooks,

and magazines.  SAC ¶ 40; Second Stratton Decl. ¶ 8.  The Ebooks Site is operated from the

same IP address as the Main Site and the Search Interface Site.  *Id.*  And, the Main Site

recommends users visit the Ebooks Site by clicking the "Download Ebooks" link provided.  *Id.*

*       *       *

As a direct result of Defendants' active and ongoing conduct, many thousands of

copyrighted works are infringed on a rampant basis, including hundreds of Elsevier's works.  *Id.*

Even though Defendants easily could stop or limit it, Defendants knowingly facilitate,

encourage, induce, and engage in the infringement because they obtain a significant financial

benefit from it.  Thus, under the legal standards set forth above, Defendants are liable for direct copyright infringement, as well as secondary copyright infringement in the form of inducement of infringement, contributory infringement, and vicarious infringement.

### D. Personal Liability

"An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement.  These principles apply equally to claims of direct infringement and claims based on secondary liability." *Lime Group*, 715 F. Supp. 2d at 521 (emphasis in original; internal quotations and citations omitted); *see also Usenet.com*, 633 F. Supp. 2d at 158 ("It is well settled in this Circuit that '[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers.'" (quoting *Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985))).  Defendants Kozlov and Kazutsin are founders and principal operators of Avax.  SAC ¶¶ 7-8.  They each personally make decisions regarding, participate in, direct, exercise control over, and benefit from Avax's infringing activities.  *Id.*  Indeed, Kozlov and Kazutsin are Avax's key decision-makers who actively direct Avax's illegal conduct.  *Id.* As such, Defendants are personally liable for the infringement that occurs through the Avax service.

## II. PLAINTIFFS ARE ENTITLED TO AN AWARD OF STATUTORY DAMAGES FOR DEFENDANTS' WILLFUL INFRINGEMENT

Once liability is established against a defaulting defendant, a court must then conduct an inquiry to ensure that there is a basis for the damages specified in a default judgment.  *See Bravado Int'l Group Merch. Servs. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 189-90 (E.D.N.Y. 2009).  Elsevier seeks $150,000 per infringed work, for a total of $37,500,000.  For the reasons

described below, the amount sought is appropriate under the circumstances of Defendants'

infringement.  Alternatively, if a lesser damages amount is appropriate, it should in no event be

less than the maximum amount for non-willful infringement ($30,000 per infringed work, for a

total of $7,500,000).

**A.**     **Statutory Damages Under the Copyright Act**

The Copyright Act provides for statutory damages in an amount not less than $750 or

more than $30,000 per copyright infringed, as the court considers just.  17 U.S.C. § 504(c)(1).  In

cases of willful copyright infringement, a court may increase the award up to $150,000 per

copyright infringed.  17 U.S.C. § 504(c)(2).  Thus, courts have wide discretion in setting an

amount of statutory damages for copyright infringement.  *See Fitzgerald Publ'g Co. v. Baylor*

*Publ'g Co.,* 807 F.2d 1110, 1116 (2d Cir. 1986).  In determining an appropriate damage award

under the Copyright Act, "courts look to considerations such as: (1) the expenses saved and the

profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the

deterrent effect on others besides the defendant; (5) whether the defendant's conduct was

innocent or willful; (6) whether a defendant has cooperated in providing particular records from

which to assess the value of the infringing material produced; and (7) the potential for

discouraging the defendant."  *See Union of Orthodox Jewish Congregations of Am. v. Royal*

*Food Distribs. LLC*, 665 F. Supp. 2d 434, (S.D.N.Y. 2009) (quoting *Fitzgerald Pub. Co. v.*

*Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2d Cir. 1986)).

Courts, including the Second Circuit, have upheld awards of maximum statutory damages

for willful copyright infringement.  *See Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 288 (2d

Cir. 1999) (upholding then-maximum statutory damages award of $100,000); *Superior Form*

*Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) (upholding

then-maximum statutory damages award of $100,000 per infringed work); *see also* Default J.

and Permanent Inj., *True Religion Apparel, Inc. v. Xiaokang Lei*, et al., No. 11-Civ-8242 (HB) (S.D.N.Y. Mar. 12, 2012) (ECF No. 31) (awarding plaintiffs maximum statutory damages for willful copyright infringement).

### B.    Elsevier's Request for Statutory Damages is Reasonable Under the Circumstances Here

In this case, Elsevier seeks an award of statutory damages in the amount of $37,500,000 for the 250 Copyrighted Works infringed.  This amount is more than warranted based on the egregious facts of this case.  Should the Court determine that a lesser amount is more appropriate, the damages figure should not be below the maximum amount for non-willful infringement, i.e., $30,000 per work infringed (with 250 works infringed, a total of $7,500,000).

The illegal reproduction and distribution of Elsevier's textbooks and other materials has caused it real and substantial harm.  Elsevier invests heavily in book publishing.  SAC ¶ 16; Stratton Decl. ¶ 5.  Each year it incurs substantial costs for author royalties and other costs of content creation or licensing, copyediting and proofreading, typesetting, layout, printing, binding, distribution, promotion, and for support of its editorial offices.  *Id*.  The revenue from Elsevier's sales and rentals of books represents a substantial portion of its annual revenues, and is therefore crucial to its financial health.  *Id*.  Elsevier actively seeks to sell legitimate copies of these works to professionals and students.  Second Stratton Decl. ¶ 10.  The sale of infringing textbooks undercuts Elsevier's ability to sell legitimate copies of the books and the perceived value of legitimate versions of the books, thereby damaging Elsevier's business reputation and good will.  *Id*.  Thus, Elsevier suffers serious financial injury when its copyrights are infringed, which ultimately results in an adverse impact on the creation of new books, on scholarly endeavor, and on scientific progress because it is more difficult to publish deserving books.  SAC ¶ 17; Stratton Decl. ¶ 6.

Defendants are willful infringers.  Defendants clearly have notice of this action but have chosen not to appear, which standing alone allows the Court to infer willfulness.  *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003); *Maletier v. Carduci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009) ("Here, by virtue of its default, [defendant] has admitted [plaintiff's] allegation that it acted knowingly and intentionally or with reckless disregard or willful blindness to [plaintiff's] rights.").  Even if that were not enough, the record warrants a finding of willfulness.  *See* Sections I.C.2.d and e, *supra*.  The massive infringement is readily apparent to Defendants as they actively operate their sites.  Nevertheless, Defendants do nothing to stop or limit it, even though they control and police their sites for other purposes.  Of course, Defendants' failures are not surprising.  The whole point of their service is to help users obtain unauthorized copies of copyrighted materials.  The sites are optimized for infringement.  In response to Elsevier's suit, Defendants not only continued infringing, attempting all the while to remain anonymous behind aliases and proxies, but further engaged in a shell game of switching to new domains in an obvious effort to maintain their profitable and illegal scheme.  Such facts are more than sufficient for a finding of willfulness.[6]

Defendants' activities need to be deterred.  The judgment entered in this action should discourage Defendants and others from engaging in copyright infringement.  *See Broad. Music,*

---

[6] Willfulness is determined by "whether the defendant had knowledge that [its] conduct represented infringement or recklessly disregarded the possibility."  *Philip Morris USA Inc. v. Marlboro Express, et al.*, No. 03-CV-1161 (CPS), 2005 WL 2076921, 2005 U.S. Dist. LEXIS 40359, at *20 (E.D.N.Y. Aug. 26, 2005); *see also Kepner-Tregoe,* 186 F.3d at 288 (holding that in the copyright context, "[t]he standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement" or whether the defendant "acted with a reckless disregard" for plaintiff's rights in its copyrighted works) (internal quotations and citation omitted).  Knowledge "need not be proven directly but may be inferred from the defendant's conduct."  *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (internal quotations and citation omitted).

*Inc. v. Pamdh Enters.*, No. 13-Civ-2255 (KMW), 2014 WL 2781846, 2014 U.S. Dist. LEXIS 84409, at *8 (S.D.N.Y. June 19, 2014) (discussing the deterrent effect on the copyright infringer and third parties as a factor in awarding statutory damages); *cf. Burberry Ltd. v. EuroModa, Inc.*, No. 08-Civ-5781 (CM)(AJP), 2009 WL 4432678, 2009 U.S. Dist. LEXIS 113407, at *15 (S.D.N.Y. Dec. 4, 2009) ("[W]here, as here, a defendant is shown to have acted willfully, a statutory award should incorporate not only a compensatory, but also a punitive component to discourage further wrongdoing by the defendants and others.") (internal quotations and citations omitted). Elsevier is facing the next generation of infringement schemes—the operation of multiple illicit websites by anonymous actors who knowingly and intentionally build a business upon providing users with quick access to infringing material. Defendants and others like them need to be deterred through a substantial award like the one requested by Elsevier.

Finally, the requested award is merely a fraction of what it could be if this case were fully litigated against Defendants. Elsevier seeks damages on only a subset of the total number of infringed works. As demonstrated above, Elsevier has recently identified an additional 26 of its works infringed. The damages amount Elsevier seeks does not contemplate these additional works, or others to be discovered after further searching, but rather is based solely on the Copyrighted Works already in suit. Furthermore, if Defendants had not defaulted and Elsevier had the opportunity to conduct discovery in this case, it is likely the number of infringing works identified would increase exponentially.

### C.   An Evidentiary Hearing to Determine Statutory Damages Is Not Required

Elsevier's request for an award of statutory damages does not require the Court to conduct an evidentiary hearing. Courts have awarded damages post-default without an evidentiary hearing based upon affidavits submitted by the plaintiff. *See Church & Dwight Co. v. Kaloti Enters. of Mich.*, 697 F. Supp. 2d 287, 295 (E.D.N.Y. 2009) (stating "where the issue is

23

statutory damages, inquest by paper record is particularly appropriate"); *Rolex Watch,* 2002 U.S. Dist. LEXIS 10054, at *5 ("Here, of course, the issue is statutory damages, making it even more appropriate to hold the inquest on a paper record."); *see also Tamarin v. Adams Caterers, Inc.*, 3 F.3d 51, 54 (2d Cir. 1993) (finding it not necessary to hold a hearing to assess post-default damages where the court relied on affidavits and documentary evidence). Therefore, a hearing to award statutory damages is not necessary.

## III.    DEFENDANTS SHOULD BE PERMANENTLY ENJOINED FROM INFRINGING PLAINTIFFS' COPYRIGHTS

"A court may issue an injunction when the moving party establishes that there is a statutory basis for relief and that it meets the prerequisites for the issuance of an injunction. The second of these conditions requires that a party seeking an injunction demonstrate irreparable harm and the absence of an adequate remedy at law." *TigerCandy Arts, Inc. v. Blairson Corp.*, No. 09-Civ-6215 (GBD), 2012 WL 760168, 2012 U.S. Dist. LEXIS 35269, at *20-21 (S.D.N.Y. Feb. 23, 2012) (internal quotations and citation omitted). "In intellectual property actions, such permanent injunctions generally are granted when there is a threat of continuing violations." *Id.* at *21 (internal quotations and citation omitted).

The first requirement is clearly met because the Copyright Act vests the Court with the power to grant injunctive relief. 17 U.S.C. § 502(a); *see also TigerCandy Arts*, 2012 U.S. Dist. LEXIS 35269, at *21 (holding first requirement met where injunctive relief sought to prevent or restrain infringement of a copyright).

The second requirement is also satisfied because Defendants, through their default, have admitted to infringing Elsevier's Copyrighted Works. As a result of the infringement, Elsevier has been harmed and will continue to suffer injury, for which it has no adequate remedy at law. Defendants have caused mass distribution of pirated "e-books." These pirated books deprive

Elsevier of lost revenues and injure Elsevier's name, reputation, and goodwill.  Moreover,

Defendants have evidenced an intention to continue infringing.  *See TigerCandy Arts*, 2012 U.S.

Dist. LEXIS 35269, at *21 (permanent injunction warranted where defendants defaulted and

evinced intention of continuing their infringing activity after plaintiffs' cease-and-desist

demands); *Software Freedom Conservancy, Inc. v. Best Buy Co.*, No. 09-Civ10155 (SAS), 2010

WL 2985320, 2010 U.S. Dist. LEXIS 75208, at *3 (S.D.N.Y. July 27, 2010) (permanent

injunction granted where defendants' conduct continued even after being informed that it was

infringing).  As discussed above, Elsevier, through this lawsuit and their emails with Defendants,

have made clear to Defendants that their infringing activity is unlawful.  But, rather than stop

their infringing activity, Defendants changed domain names and continued operating the Avax

service under the apparent assumption that they are immune from the law.

Given Defendants' flagrant and repeated infringement, their offshore location, and their

disregard for this lawsuit, there is every reason to believe that Defendants will not comply with

an injunction mandating they cease infringing Elsevier's copyrights.  Moreover, for these same

reasons, it is unlikely that Elsevier will ever recoup the money damages to which it is entitled.

Recognizing these unfortunate realities, Elsevier thus requests injunctive relief tailored to suit the

unique challenges faced here and the ease by which Defendants can continue their infringing

service.  As laid out in the proposed order submitted herewith, Elsevier requests the permanent

injunction not only enjoin Defendants from infringing any of Elsevier's copyrighted works, but

also order Defendants to surrender to Elsevier the domain names underlying Defendants' pirate

websites.

The reasons for the injunction transferring Defendants' domain names are compelling.

Defendants' business exists for the ***sole purpose*** of infringement.  Defendants have no right to

use such domain names for that purpose.  Moreover, Defendants have demonstrated their intent to continue infringing despite their knowledge of this lawsuit and the unlawfulness of their actions.  *See* Second Stratton Decl. ¶ 6, Ex. 2 (illustrating extent of ongoing infringement on Avax's Main Site).  Accordingly, forcing Defendants to surrender the domain names behind their piratical activities is perhaps the only remedy that will have a real impact on the infringement.

An injunction requiring the transfer of the domain names associated with the infringing sites is appropriate where, as here, Defendants are likely to continue their unlawful conduct.  *See Craigslist, Inc. v. Doe*, Case No. C09-4739 SI, 2011 WL 1897423, 2011 U.S. Dist. LEXIS 53123, at *12 (N.D. Cal. Apr. 25, 2011) ("Based on the likelihood that [defendant] will continue his unlawful conduct, I … recommend that [plaintiff's] request for the transfer of [defendant's] websites … be granted."), *report and recommendation adopted by* 2011 WL 1884555, 2011 U.S. Dist. LEXIS 53204 (N.D. Cal. May 18, 2011).  Courts in this district have granted similar injunctive relief against infringers.  *See, e.g., Phillip Morris USA, Inc. v. Otamedia, Ltd.*, 331 F. Supp. 2d 228, 247 (S.D.N.Y. 2004) (modifying injunction and ordering that defendant's domain names be transferred to plaintiff); *True Religion Apparel*, No. 11-Civ-8242 (HB) (S.D.N.Y. Mar. 12, 2012), Mustico Decl. ¶ 20, Ex. D (issuing default judgment and permanent injunction ordering transfer of defendant's domain names); Default J. and Permanent Inj., *North Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd.*, No. 10-Civ-1630 (AKH) (S.D.N.Y. Sept. 13, 2010) (ECF No. 29), Mustico Decl. ¶ 22, Ex. E (same); Order, *Pearson Educ., Inc. v. Nugroho*, Case No. 08-CV-8034 (DAB) (AJP) (S.D.N.Y. Oct. 10, 2013) (ECF No. 53), Mustico Decl. ¶ 22, Ex. F (modifying permanent injunction to order transfer of defendant's domain names).

In sum, all of the factors weigh in favor of the permanent injunction Elsevier requests.

## CONCLUSION

Defendants' infringement of Elsevier's Copyrighted Works has irreparably harmed and continues to harm Elsevier. Defendants have entirely ignored this lawsuit, choosing instead to hide from the Court. Without entry of the requested relief, Defendants will continue to infringe. Elsevier, therefore, respectfully requests that the Court enter default judgment awarding statutory damages of up to $37,500,000, but not less than $7,500,000, against Defendants and enter the proposed order permanently enjoining Defendants from infringing Elsevier's copyrights.

Dated:  March 23, 2015

Respectfully submitted,

Matthew J. Oppenheim
Scott A. Zebrak (admitted *pro hac vice*)
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Ave. NW, Suite 503
Washington, DC 20015
Tel:  202-621-9027
matt@oandzlaw.com
scott@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiff*
*ELSEVIER, INC.*